**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRADEN TURNER, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KORNER, DIXIT JOSHI, THOMAS GOTTSTEIN, and DAVID R. MATHERS,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Braden Turner ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the

1

Defendants' public documents, public filings, wire and press releases published by and regarding Credit Suisse Group AG ("Credit Suisse" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired Credit Suisse American Depository Shares ("ADSs") between March 10, 2022 and March 15, 2023, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Credit Suisse's securities trade on the New York Stock Exchange ("NYSE"). Accordingly, there are investors in Credit Suisse's securities located within the U.S., some of whom reside in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.      Plaintiff Braden Turner, as set forth in the accompanying certification, incorporated by reference herein, acquired Credit Suisse ADSs during the Class Period and was economically damaged thereby.

7.      Defendant Credit Suisse is a financial services company, which engages in the provision of financial services. It operates through the following four divisions: Wealth Management, Investment Bank, Swiss Bank, and Asset Management.

8.     Credit Suisse is organized under the laws of Switzerland with its principal executive office located at Paradeplatz 8, 8001, Zurich, Switzerland. Credit Suisse's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CS."

9.     Defendant Axel P. Lehmann ("Lehmann") has served as Chairman of the Board of Directors since January 2022.

10.    Defendant Ulrich Korner ("Korner") has served as the Company's Chief Executive Officer ("CEO") since August 2022.

11.    Defendant Dixit Joshi ("Joshi") has served as the Company's Chief Financial Officer ("CFO") since October 2022.

12.    Defendant Thomas Gottstein served as the Company's CEO from February 2020 to July 2022.

13.    Defendant David R. Mathers served as the Company's CFO from October 2010 to April 2022.

14.    Defendants Lehmann, Korner, Joshi, Gottstein, and Mathers are collectively referred to herein as the "Individual Defendants."

15.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

16.     Credit Suisse is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     Credit Suisse and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Class Period

19.     On March 10, 2022, the Company filed with the Securities and Exchange Commission ("SEC") its 2021 annual report (the "2021 Annual Report") on Form 20-F for the year ended December 31, 2021. The 2021 Annual Report was signed by Defendants Gottstein and Mathers attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. The 2021 Annual Report failed to identify any material weaknesses with the Company's internal controls, which stated the following, in relevant part:

**Evaluation of disclosure controls and procedures**

The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's ***disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required.***

\*     \*     \*

Based upon its review and evaluation, management, including the Group CEO and CFO, ***has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021.***

6

The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.

**Changes in internal control over financial reporting**

***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting.***

(Emphasis added.)

20.    On December 1, 2022, the *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm'" citing Defendant Lehmann and stating that Credit Suisse clients had returned to the bank after pulling out tens of billions of dollars of assets at the start of October. The article stated in relevant part:

Axel Lehmann said ***withdrawals had flattened across the group and had started to reverse in the Swiss domestic business***, but the scale of the outflows had caught the Swiss lender off-guard.

"It ***was*** a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It ***was*** a storm in the retail and partially in the wealth management segment, in particular in Asia, ***where we had really massive outflows for two to three weeks***."

"The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."

He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."

7

(Emphasis added.)

21.     On December 2, 2022, before market hours, in a *Bloomberg TV* interview, Lehmann stated that outflows "basically have stopped" after it had disclosed on November 23, 2023 the loss of 84 billion francs or $90.8 billion of client assets.

22.     Also on December 2, 2022, *Bloomberg* published an article entitled "Credit Suisse Gains Most Since 2020 After Asset Outflows Halted" quoting Lehmann's assurances regarding the Company's financial stability. The article stated in relevant part:

> Credit Suisse Group AG Chairman Axel Lehmann said the ***main indicators of the bank's financial stability were strong*** and that its level of liquidity is improving after declines in recent weeks.
>
> *          *          *
>
> ***In October, outflows of assets and the subsequent use of liquidity buffers had caused the bank to fall below certain regulatory levels at some of its entities.***
>
> ***Credit Suisse saw 84 billion francs ($89.7 billion) of client asset withdrawals in the first few weeks of the fourth quarter amid persistent rumors about the bank's stability.*** Credit spreads and the cost to insure the bank's debt against default have surged to above 400 basis points, far above peers. ***The outflows have "basically stopped," Lehmann said.***
>
> *          *          *
>
> Credit Suisse shares slumped to record lows in recent days and approached the price of the rights offer that's part of the bank's $4 billion capital increase, signaling investor skepticism.

*Yet the stock rebounded after Lehmann's comments on Friday, helping to arrest the losing streak.* It traded up as much as 6.73% to 2.86 Swiss francs in Zurich.

(Emphasis added.)

23.    The statements contained in ¶¶ 19-22 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as opposed to contrary statements, the Company was experiencing significant outflows throughout its fourth quarter; (2) the Company was experiencing material weaknesses with internal controls , and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH EMERGES

24.    On February 9, 2023, before market hours, the Company filed with the SEC its quarterly report on Form 6-K for the period ended December 31, 2022 (the "4Q22 Report"). The 4Q22 Report, stated the following, in relevant part:

**4Q22 results**

*As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased CHF 107.0 billion compared to the end of 3Q22. The decrease was mainly driven by net asset outflows of CHF 110.5 billion and foreign exchange-related movements*, partially offset by favorable market movements of CHF 27.6 billion.

*Net asset outflows of CHF 110.5 billion in 4Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF*

**92.7 billion in Wealth Management were driven by outflows across all regions.** Approximately two-thirds of the outflows were concentrated in October 2022. **The outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22 but had not reversed.** Net asset outflows of CHF 11.7 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in multi-asset solutions, index solutions and fixed income, from investments and partnerships, primarily related to an emerging markets joint venture, and from alternative investments, primarily related to outflows in credit. Net asset outflows of CHF 8.3 billion in Swiss Bank mainly reflected outflows in the private clients business.

*    *    *

As previously disclosed, Credit Suisse experienced deposit and net asset outflows in 4Q22 at levels that substantially exceeded the rates incurred in 3Q22. Approximately two thirds of the net asset outflows in the quarter were concentrated in October 2022 and had reduced substantially for the rest of the quarter. We have taken comprehensive measures to further increase our client engagement and regain deposits as well as Assets under Management (AuM).

(Emphasis added).

25.     On this news, the price of Credit Suisse ADS's fell 15.6% to close at $3.02 per ADS on February 9.

26.     On March 9, 2023, the Company issued an ad hoc announcement stating it would delay the publication of its 2022 Annual Report and related Annual Report after a call on March 8, 2023, from the SEC regarding the Company's cash flow statements in the years ended December 31, 2020, and 2019, as well as related controls.

10

27.     On this news, the price of Credit Suisse ADS's fell 4.48% to close at $2.77 per ADS on March 9, 2023.

28.     On March 14, 2023, the Company filed with the SEC its 2022 annual report (the "2022 Annual Report") on Form 20-F for the year ended December 31, 2022. The 2022 Annual Report was signed by Defendants Korner and Joshi. The 2022 Annual Report identified material weaknesses in the Company's internal controls, which stated the following, in relevant part:

> **We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021**
>
> Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective.***
>
> ***The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This***

***material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.***

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition.***

(Emphasis added.)

29.     On this news, the price of Credit Suisse ADS's fell 1.18% to close at $2.51 per ADS on March 14.

30.     On March 15, 2023, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing

Saudi National Bank ("SNB") would not buy any more of the Company's shares on regulatory grounds.

31. On this news, the price of Credit Suisse ADS's fell 13.94% to close at $2.16 per ADS on March 15, further damaging investors.

32. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Credit Suisse ADSs on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery,

Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

39. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Plaintiff and members of the Class purchased, acquired and/or sold Credit Suisse ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

40.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

46. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

47.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

48.     As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

49.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

50.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

51.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of outflows.

54.     As officers and/or directors of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

55.     Because of the position of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company ADSs.

56.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:       March 16, 2023                    **THE ROSEN LAW FIRM, P.A.**


/s/Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*